**530**

CARGILL, INCORPORATED, as owner of the North and South Loading Gallery Dock Installations, in the Port of Albany, State of New York, Libellant,

v.

TRANSAMERICAN STEAMSHIP CORPORATION and American Union Transport, Inc., Respondents,

and

Matton Transportation Co., Inc., Respondent-Impleaded,

TUG JOHN E. MATTON, Tug John E. Matton, Inc., Claimant-Impleaded.

AMERICAN UNION TRANSPORT, INC., as owner of the STEAMSHIP TRANSUNION, Libellants,

v.

MATTON TRANSPORTATION CO., Inc., Respondent.

United States District Court
S. D. New York.
July 6, 1962.

Dougherty, Ryan, Mahoney & Pellegrino, New York City, for Transamerican S. S. Corp. and American Union Transport, Inc. (Thomas J. Short, New York, City, of counsel).

Mudge, Stern, Baldwin & Todd, New York City, for Cargill, Inc. (Robert P. Shaughnessy, New York City, of counsel).

Mahar & Mason, New York City, for Tug John E. Matton, and Matton Transportation Co., Inc.

THOMAS F. MURPHY, District Judge.

By stipulation and approval of the court this trial was limited to the issues raised by the first cause of action pleaded in the libel, which is for damages sustained by libellant's Albany dock and grain elevator facilities when they were struck by the S. S. Transunion on September 19, 1957. It was also stipulated that libellant, Cargill, Inc., is entitled to a decree against either or both of the vessels and their owners for the damages resulting from negligence which, concededly, is in no way attributable to libellant.

The principal question involved is whether the tug "John E. Matton" was in any way negligent with regard to the berthing of the Transunion and whether such negligence, if any, contributed to the collision with plaintiff's dock. Also involved is whether or not the owners of the Transunion had contracted for the services of the tug to assist in the docking of the Transunion at Albany on the day of the accident.

The Transunion is a single screw vessel, 446 feet in length and 60 feet wide, with a draft of 6′ 5″ forward and 12′ 1″ aft. At the time in issue she was light, and without cargo. Her hull stood 27′ above the water and her superstructure 30 feet above her deck. The tug "John E. Matton" is approximately 85 feet long and 23 feet wide, and of 1200 horsepower.

On September 18, 1957, the Transunion left New York City bound for Albany under the direction of Pilot James Still-

wagon. On that day the Transunion's agent in Albany was advised that the vessel would be arriving the next day and the agent notified the tug's master of that fact, as was his custom and practice. The master of the Transunion, Captain Sulcs, testified that he was told by the ship's operations manager prior to leaving New York City and while enroute, that a tug had been ordered to assist in berthing the vessel at the Cargill grain dock in Albany.

According to the testimony of the tug master and the Transunion's agent in Albany, no such order was placed for the tug's services. There was merely the communication to the tug master of the expected arrival of the Transunion and that was to permit him to be down river, if he chose, at the proper time, to offer his services to the vessel.

On September 19, 1957, the weather was clear and the wind was from the southeast at 15 to 20 mph. The tide was flooding.

At about noon on the 19th the Transunion was proceeding north, upriver, when it came abreast of the tug which had tied up to the Esso dock approximately one and three-quarter miles south of the Cargill facilities. The tug was there awaiting the arrival of an Esso vessel which it had been engaged to assist and which was late. The tug master called out to the Transunion several times as it was passing, about 150 feet off, to see if his services were required. This was the customary manner in which such inquiry was made by the tug, and if the response was in the affirmative it was usually signified by the vessel giving two long and two short blasts on its whistle. On this occasion there was no response at all and the Transunion continued upriver to a point about one-half to three-quarters of a mile south of the Cargill pier where there is a wide spot in the river used as a turning basin. There the Transunion began to maneuver so as to have its bow swing around and face south, downstream. The distance shore to shore at this point is about 1500 feet. Just north of the turning basin where the grainery is located, the channel is approximately 700 feet wide.

The pilot testified that he thought to turn around until the tug, which he believed had been arranged for, came alongside. In that turning maneuver he dropped his port anchor and it remained down until the turn was completed, about ten minutes. He waited a short while, four or five minutes, and when no tug came he decided to try to dock unassisted and proceeded upriver at dead slow astern. Under the wind and tide conditions then prevailing, the vessel was immediately in difficulty. Her light draft, and the length and height of her hull and superstructure presented a broad area to the wind which forced the bow in towards the west bank. The ship drifted north crosswise in the river at angles from 45 degrees to 60 degrees with the shoreline, with the stern to the northeast and the bow southwest pointing in towards the west shore. The pilot testified that to avoid the stern striking the east bank he pushed his vessel's bow into the west bank. The ship's starboard bow dragged along the west bank striking first concrete ways, then trees and finally libellant's grain dock. The ship's engines were continually backing in an effort to straighten out and the wind continued to blow from the southeast about 20 mph. pushing the bow against the shore. In the meantime one of the witnesses, Mr. Hendrickson, who had been observing the difficulty that the Transunion was in, made a hurried telephone call for the tug which responded and reached the vessel at about the time it was brushing through the trees at a point approximately 50 or 60 feet from the Cargill pier. The tug approached the ship and was ordered by the pilot to put a line on the port bow. This was done with the tug at right angles to the port bow of the ship. The pilot gave a two blast signal for the tug to go astern and thereby to pull the ship's bow off the bank. The pilot, after about three minutes, then blew one whistle for the tug to stop, which was done. All the while the Transunion continued backing with its own engines. The pilot again

gave a two blast signal but the backing motion of the ship pulled the tug forward and around with the result that the bow again fell into the shore and struck the grain dock facilities of libellant.

Contrary to the facts as we find them, the Transunion contended that the tug went forward instead of astern and pushed the bow into the Cargill pier. It is clear that there are only factual issues presented by the pleadings and testimony and none of the parties has cited a single authority in support of any legal argument.

One thing appears to be unanimously agreed and that is that the Transunion needed a tug to safely dock under the prevailing conditions. We find that it was folly to attempt to maneuver itself into berth under the circumstances. We find also that there was in fact no contract or agreement for the tug to assist in the docking and that its assistance, belatedly sought, in no way contributed to the damages complained of. We conclude that the Transunion was solely at fault and that the tug was in no way negligent.

Settle decree.

This memorandum is filed in lieu of findings of fact and conclusions of law.